# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| URBAN AIR INITIATIVE, INC., *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 15-1333 (ABJ) |
| ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| Defendant. | ) | |

---

## MEMORANDUM OPINION

The Urban Air Initiative, Inc. and Energy Future Coalition have filed a motion for an award of attorneys' fees and costs pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(E). Pls.' Mot. for Attorneys' Fees and Costs [Dkt. # 71] ("Pls.' Mot."). Plaintiffs seek a total award of $189,288.40, including: $141,792.60 for litigation-phase fees; $400 in costs; and $47,095.80 in "fees-on-fees" for time spent negotiating and drafting the motion and reply in support of their motion for attorneys' fees. *Id.* at 2; Pls.' Reply in Supp. of Mot. for Attorneys' Fees and Costs [Dkt. # 78] ("Pls.' Reply") at 24. Defendant Environmental Protection Agency ("EPA") maintains plaintiffs are neither eligible for, nor entitled to, a FOIA fee award, and that the amount sought is unreasonable. Def.'s Opp. to Pls.' Mot. [Dkt. # 75] ("Def.'s Opp.") at 34–35.

The Court finds that plaintiffs are eligible for and entitled to a fee award, but the amount requested was not reasonable. Accordingly, the Court will award a reduced fee in the amount of $75,400.00.

# BACKGROUND

## I.   Factual Background

The Urban Air Initiative ("UAI") is a nonprofit social welfare organization dedicated to educating the public about health threats posed by petroleum-based fuels.  Compl. [Dkt. # 1] ¶ 3. Energy Future Coalition ("EFC") is a nonprofit organization dedicated to advancing practical and bi-partisan solutions to energy and environmental policy challenges.  *Id.* ¶ 4.

In the Energy Policy Act of 2005, Congress instructed the EPA to produce an updated vehicle emissions model that considered the effect of individual fuel properties on emissions from vehicles.  Declaration of Kathryn Sargeant [Dkt. # 19-3] ("Sargeant Decl.") ¶ 10.  In order to create this model, which would become known as the MOVES2014 model, the EPA, the Department of Energy, and the Coordinating Research Council conducted a study entitled EPAct/V2/E–89 Tier 2 Gasoline Fuel Effects Study ("EPAct study").  *Id.* ¶ 8; Compl. ¶ 6.  Ultimately, the MOVES2014 model included data from a range of sources, including the EPAct Study.  Sargeant Decl. ¶ 10.

According to plaintiffs, the EPAct study was the "basis for erroneous emissions factors" in MOVES2014 and would result in increased air pollution.  Compl. ¶ 7.  Specifically, "the MOVES2014 model projects that increasing concentration of ethanol in gasoline contributes to increased emissions of various pollutants," but plaintiffs contend that "in reality, ethanol reduces emissions of these pollutants."  *Id.*  So plaintiffs, along with the states of Kansas and Nebraska, petitioned for judicial review of EPA's MOVES2014 model in the D.C. Circuit, partially on the basis of "pollution modeling errors that are the direct result of defects in the EPAct study's design." *Id.* ¶ 10; Ex. A to Compl. [Dkt. # 1-1] ("*Kansas v. EPA* Brief").

Plaintiffs submitted a FOIA request on February 9, 2015 to obtain information about the EPAct study.  Compl. ¶ 14.  EPA's Office of Transportation and Air Quality received the request

on February 10, and confirmed receipt on February 19.  Ex. B. to Sargeant Decl. [Dkt. # 19-4].

On March 9, 2015 defendant informed plaintiffs that their request would yield an estimated 83,000

responsive records at a cost of $24,000, and it encouraged plaintiffs to narrow the scope of their

request.  Sargeant Decl. ¶ 15.  After discussion between the parties, on April 2, 2015, plaintiffs

revised their request to call for one contract, two work assignments, and all information related to

the "design phase" of the EPAct study – defined as "everything that preceded the emissions testing

that resulted directly in the reported results of any phase of the EPAct study."  Ex. J to Compl.

[Dkt. # 1-1] ("Revised FOIA Request"); Compl. ¶¶ 16–19.  Plaintiffs emphasized that their request

was time sensitive due to ongoing litigation challenging MOVES2014, and they noted that they

were amenable to receiving records as they became available.  *See* Revised FOIA Request.  On

April 24, 2015, EPA sent plaintiffs a letter estimating that there would be 36,000 potentially

responsive records at a cost of $18,000, and plaintiffs agreed to pay all legitimate costs in a letter

two days later, again noting urgency.  Compl. ¶¶ 20–21.

On June 15, 2015, defendant sent plaintiffs a letter projecting a completion date for

production of February 15, 2016 due to the "broad scope of the request" and the "significant

amount of EPA's time and resources" required to find and examine both electronic and unindexed

paper records.  Ex. N to Compl. [Dkt. # 1-1] ("EPA Extension").  In response, plaintiffs proposed

a September 2015 deadline for native electronic files and an October 2015 deadline for all other

records.  Compl. ¶ 25; Ex. O to Compl. [Dkt. # 1-1].  On June 25, defendant declined plaintiffs'

proposed deadlines.  Compl. ¶ 26; Ex. P to Compl. [Dkt. # 1-1] ("June 25, 2015 EPA Reply").  At

that time, defendant did produce the one contract and two work assignments plaintiffs requested

but it explained that because responsive emails were archived on legacy systems,[1] there was "still considerable uncertainty about the time [necessary] to produce and review those records."  Compl. ¶ 28; June 25, 2015 EPA Reply.  Defendant also noted that staff members in possession of responsive records had other mission-critical priorities and that management and legal resources were limited, particularly due to plaintiffs' ongoing judicial challenge to MOVES2014 in the D.C. Circuit.  June 25, 2015 EPA Reply.

## II.   Procedural Background

Plaintiffs submitted their FOIA request to defendant on February 9, 2015.  Compl. ¶ 14. Defendant contacted plaintiffs by letter dated March 9, 2015 to inform them that after an initial search, it estimated more than 83,000 potentially responsive records.  Ex. F to Compl. [Dkt. # 1-1].  In an email dated March 11, 2015 and a letter dated April 2, 2015, plaintiffs narrowed the scope of the FOIA request.  Ex. G to Compl. [Dkt. # 1-1]; Ex. J to Compl. [Dkt. # 1-1].  Based upon the date of the revised FOIA request, defendant was required to notify plaintiffs within twenty days, absent unusual circumstances, whether or not it would comply with the request.  5 U.S.C. § 552(a)(6)(A)(i).

While defendant responded to plaintiffs on April 24, 2015, indicating that after an initial search regarding the modified request, there were potentially approximately 36,000 responsive records which would take about 650 hours to search for, review, and produce, *see* Ex. K to Compl. [Dkt. # 1-1]; Ex. L to Compl., [Dkt. # 1-1], it was not until June 15 (51 business days after the revised request was submitted) that defendant informed plaintiffs that it would comply with their request.  Ex. N to Compl. [Dkt. # 1-1] ("EPA Extension Request").  In defendant's June 15 letter,

---

1    EPA transitioned to a new e-mail client in 2013 so EPA's information technology office had to search for responsive records from 2006-2009 on an archived system.  *See* Sargeant Decl. ¶ 33.

it relayed that because of the volume of records involved, the locations of responsive documents, and the way records were stored, it would not be able to complete production until February 2016. *Id.* Defendant also indicated that agency staff involved in responding to the FOIA request were also involved in responding to the separate judicial challenge, thereby diverting resources that could have contributed to a more expeditious production. *Id.*

Plaintiffs sought a completion date of October 2015, Ex. O to Compl. [Dkt. # 1-1], and on June 25, defendant made its first production, which consisted of three documents, and reaffirmed its February 2016 completion date in a letter. Ex. P to Compl. [Dkt. # 1-1]. In that letter, defendant explained that:

> EPA has limited staff to apply to this request. The program staff who hold[s] the records have other mission-critical priorities that also must be addressed, and there is also a limited amount of management and legal resources available to review the responsive documents, particularly given the related litigation that will be ongoing this summer and fall.

*Id.* Defendant made no further productions that summer.

Because defendant failed to respond to plaintiffs' FOIA request within the statutorily-prescribed time,[2] plaintiffs filed this lawsuit on August 17, 2015 alleging defendant was "unlawfully withholding responsive records." Compl. ¶¶ 14, 31–37; 5 U.S.C. § 552(a)(6)(A)–(C). Defendant answered on November 12, 2015, Def.'s Answer [Dkt. #5], and the Court ordered

---

2      Defendant was required to determine whether it would comply with plaintiffs' request and notify plaintiffs within twenty business days, or thirty in unusual circumstances, after request for an extension. 5 U.S.C. § 552(a)(6)(A)–(B). Plaintiffs submitted their revised FOIA request on April 2, 2015, thus defendant should have responded by May 14, 2015 at the latest. Revised FOIA Request; Compl. ¶ 32. Defendant responded on June 15, 2015 requesting an extension. EPA Extension.

defendant to file a dispositive motion or a report setting forth a schedule for completion of production.  Order (Nov. 13, 2015) [Dkt. # 6].

Defendant submitted a status report on December 11, 2015, indicating that it had produced forty-three records through November 20, 2015, and proposed deadlines of February 28, 2016 for non-exempt records and May 31, 2016 for records not entitled to confidential treatment.  Def.'s Status Report and Doc. Produc. Schedule [Dkt. # 7] at 1, 3, 7.  Plaintiffs objected to this schedule, and the Court referred the action to a Magistrate Judge for mediation, which was unsuccessful. Order (Dec. 21, 2015) [Dkt. # 9]; Pls.' Status Report and Renewed Proposal for FOIA Produc. Schedule [Dkt. # 10] ("Pls.' Renewed Proposal") at 1.  Defendant continued producing records according to its proposed schedule, and by January 7, 2016, it had produced a total of 684 records. Ex. Q to Def.'s Mot. for Summ. J. [Dkt. # 19-5].  On January 13, 2016 the Court issued a production schedule, calling for all non-exempt responsive records to be produced on a rolling basis, on January 15, January 29, February 15, and February 29, 2016.  Min. Order (Jan. 13, 2016). The Court further ordered defendant to prioritize any responsive emails, and ordered that all responsive records not entitled to confidential treatment be produced by May 31, 2016.  *Id.*; Def.'s Status Report [Dkt. # 11] at 1–2.

Throughout January and February, defendant adhered to the ordered timeline, requesting one extension, and produced approximately 3,980 records in full and 196 records with redactions. Defendant withheld 136 records in full.  Def.'s Mot. for Summ. J. [Dkt. # 19] ("Def.'s Mot.") at 2; Sargeant Decl. ¶ 49.

On September 2, 2016, defendant moved for summary judgment, arguing that it had met its FOIA obligations.  Def.'s Mot. at 1.  Plaintiffs opposed the motion and moved for partial summary judgment arguing that: (1) 198 records were improperly withheld pursuant to FOIA

6

Exemption 5, (2) two records were improperly redacted as partially non-responsive; (3) all remaining e-mail attachments were improperly redacted as non-responsive; and (4) defendant's search was inadequate. *See* Pls.' Opp. & Cross-Mot. for Partial Summ. J. [Dkt. # 21] ("Pls.' Cross-Mot.") at 16–35; Pls.' Cross-Reply in Supp. of Pls.' Cross–Mot. [Dkt. # 34] ("Pls.' Cross-Reply") at 6–24.   Defendant voluntarily released 188 records responsive to the second and third issues, thereby rendering them moot.   Def.'s Sur-Reply [Dkt. # 36] ("Def.'s Sur-Reply") at 2; Resp. to Court's Min. Order [Dkt. # 45] at 1–2; Resp. to Court's Order [Dkt. # 48] at 1–2.

The Court denied plaintiffs' motion and granted in part and denied in part defendant's motion on the grounds that defendant had properly invoked Exemption 5 to redact or withhold records, but it had failed to establish that it had conducted an adequate search. *Urban Air Initiative, Inc. v. Envtl. Prot. Agency*, 271 F. Supp. 3d 241, 246 (D.D.C. 2017).

On January 19, 2018, defendant filed a joint status report stating that it had conducted a renewed search in accordance with the Court's summary judgment order and opinion, and it was reviewing records to identify responsive, non-exempt information.   Joint Status Report [Dkt. # 55] at 1.   Defendant proposed a production schedule – to which plaintiffs did not object – that encompassed three phases:   Phase 1, which called for rolling production of all non-exempt, non-confidential responsive records, would be completed by April 13, 2018; Phase 2, which would entail the completion of confidentiality determinations of certain records, would be completed by July 6, 2018; and Phase 3, which would give the parties time to evaluate the status of the case, would be completed by August 3, 2018.   *Id*. at 2.

The Court issued an order on January 22, 2018, adopting the parties' proposed due dates. Min. Order (Jan. 22, 2018).   The Court established a schedule for production of non-exempt

records on a rolling basis on February 16, March 16, and April 13.  *Id.*  Defendant complied with this order and produced an additional 1,140 records.  Def.'s Status Report [Dkt. # 59].

On December 4, 2018, EPA filed a renewed motion for summary judgment.  Def.'s Renewed Mot. for Summ. J. [Dkt. #6 6] ("Def.'s Renewed Mot.").  The parties stipulated to the dismissal of the case on February 11, 2019.  Joint Stipulation for Dismissal [Dkt. # 69].  On May 16, 2019, plaintiffs moved for attorneys' fees.  Pls.' Mot. at 2.

## ANALYSIS

FOIA provides that courts may assess "against the United States reasonable attorney fees and other litigation costs reasonably incurred . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  To recover fees and costs, plaintiffs must first show that they are both eligible and entitled to an award.  *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011), citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 470 F.3d 363, 368–69 (D.C. Cir. 2006).  A plaintiff is eligible for attorneys' fees if it "substantially prevailed," either by obtaining relief either through a judicial order, § 552(a)(4)(E)(ii)(I), or by causing "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial."  § 552(a)(4)(E)(ii)(II); s*ee Brayton*, 641 F.3d at 524*.*  Only eligible plaintiffs are entitled to an award of attorneys' fees.

To determine whether an eligible plaintiff is entitled to an award, a court balances a combination of factors, including the public benefit of the disclosure, the nature of the plaintiff's interest, whether any commercial benefits were derived, as well as the reasonableness of an agency's initial withholding.  *Davy v. C.I.A.* ("*Davy II*"), 550 F.3d 1155, 1159 (D.C. Cir. 2008); *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice* ("*CREW*"), 820 F.

Supp. 2d 39, 45 (D.D.C. 2011) (emphasizing shifting nature of analysis as no criteria alone is dispositive).

After determining that the plaintiff is both eligible for and entitled to an award, the court must assess whether the amount requested is reasonable after considering the number of hours spent on particular tasks, the requested hourly rates, the prevailing market rates in the relevant community, and the attorneys' skill and experience. *See* § 552(a)(4)(E)(i) (providing "reasonable" costs may be assessed); *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

In exercising its discretion, courts must bear in mind the fundamental policy behind granting fee awards: to "encourage the maximum feasible public access to government information" and "facilitate citizen access to the courts to vindicate their statutory rights." *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977). As a result, the "touchstone of a court's discretionary decision" must be whether an award is necessary to advance the goals underlying the Freedom of Information Act. *See id.*

Here, defendant challenges both plaintiffs' eligibility for and entitlement to an award, and it argues that even if plaintiffs were eligible and entitled, their requested fees are unreasonable.

## I.   Plaintiffs are eligible for a fee award.

There are two ways a plaintiff can show it has "substantially prevailed" and is therefore eligible for an award under FOIA. First, a plaintiff substantially prevails when it secures "a judicial order, or an enforceable written agreement or consent decree." § 552(a)(4)(E)(ii)(I); *Campaign for Responsible Transplantation v. Food & Drug Admin.* ("*CRT*"), 511 F.3d 187, 193 (D.C. Cir. 2007). Scheduling orders requiring production by a certain date may qualify – even when the orders adopt timelines proposed by the agency and agreed to by the plaintiff – because with their entry, the plaintiff has gained a judgment that can be enforced through contempt. *See Davy v.*

9

*C.I.A.* ("*Davy I*"), 456 F.3d 162, 166 (D.C. Cir. 2006); *Edmonds v. F.B.I.*, 417 F.3d 1319, 1323 (D.C. Cir. 2005); *CREW*, 820 F. Supp. at 44 (noting plaintiff "substantially" prevailed in securing scheduling and production by a certain date).

Second, a plaintiff substantially prevails when its suit causs a "voluntary or unilateral change in position by the agency." § 552(a)(4)(E)(ii)(II). This basis for prevailing is often referred to as the "catalyst theory." *Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 752 (D.C. Cir. 2010) (noting that Congress added § 552(a)(4)(E)(ii)(II) in 2007 after the Supreme Court rejected the catalyst theory under a different statute so that FOIA plaintiffs could prevail when their lawsuits prompted defendants' response).

Plaintiffs contend that they "substantially prevailed" under both theories. First, they argue that they obtained judicial relief under § 552(a)(4)(E)(ii)(I) when this Court issued two orders requiring production of responsive records: (1) the January 13, 2016 order requiring production on a rolling basis, and (2) the January 22, 2018 order requiring production of responsive records from the renewed search after the Court issued its summary judgment decision. Pls.' Mot. at 4, 6–7. Second, they maintain that under § 552(a)(4)(E)(ii)(II), their suit and the motion for summary judgment caused a "voluntary or unilateral change in position by the agency," because defendant began its search for responsive documents only after the suit was initiated, and it voluntarily released contested documents only after plaintiff cross-moved for summary judgment. Pls.' Mot. at 8–9.

The Court finds that plaintiffs have substantially prevailed by securing judicial relief and by causing a unilateral change in position by the agency that was not insubstantial. The Court ordered production according to a specific schedule on January 13, 2016, calling for a rolling production to be completed by February 29, 2016 for all non-exempt, non-CBI records. *See* Min.

Order (Jan. 13, 2016).  And, of more significance, on September 25, 2017, the Court granted in part and denied in part defendant's motion for summary judgment and denied plaintiffs' cross-motion for summary judgment.  Order [Dkt. # 50] ("Sept. 25, 2017 Order").  The Court ruled in plaintiffs' favor by finding the search to be inadequate, and plaintiff obtained relief when, on January 22, 2018, the Court ordered defendant to produce responsive, non-exempt, non-CBI records on a rolling basis to be completed by April 13, 2018.  Min. Order (Jan. 22, 2018).  Both the January 13, 2016 order and the January 22, 2018 order imposed enforceable legal obligations on the defendant.

Defendant maintains nonetheless that plaintiffs did not prevail, because the two orders were merely "procedural ruling[s]" that did not require production of any specific documents, and it relies upon *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Dep't of Energy* ("*OCAW*"), 288 F.3d 452, 458 (D.C. Cir. 2002).  In *OCAW*, the district court had simply ordered an agency to conduct a more thorough search, and it did not issue an order that any records be produced.  *Id.* at 457.  The D.C. Circuit reversed the fee award on the grounds that the "procedural ruling" could not serve as a basis for a finding that plaintiff had prevailed.  *Id.* at 458.

But here, the Court did more than order the agency to re-double its efforts.  In its January 13, 2016 minute order, the Court stated:

> [D]efendant shall review and produce responsive, non-exempt, and non-CBI records to plaintiffs on a rolling basis on January 15, 2016, January 29, 2016, February 15, 2016, and February 29, 2016, and it shall produce all responsive CBI records not entitled to confidential treatment by May 31, 2016.  It is FURTHER ORDERED that of the more than 15,000 records that have already been identified, defendant shall review and produce responsive emails first . . . .  Defendant shall submit reports to the Court updating it on the status of the rolling production on February 1, 2016, March 1, 2016, and June 1, 2016, and those reports should indicate the number of records reviewed, the number produced, and the number of any records withheld in full or in part.

Min. Order (Jan. 13, 2016).  The Court's January 22, 2018 minute order stated:

> Defendant must produce responsive, non-exempt, non-CBI records on a rolling basis on February 16, 2018, March 16, 2018, and April 13, 2018, and it must file a status report concerning the status of the rolling productions on April 16, 2018. Defendant must produce records found not entitled to confidential treatment by July 6, 2018. And defendant must file a status report on August 3, 2018.

Min. Order (Jan. 22, 2018).

The D.C. Circuit has held that orders requiring agencies to produce records by a certain date are sufficient to "render the plaintiffs who secure them prevailing parties eligible for attorney's fees." *Judicial Watch v. FBI*, 522 F.3d 364, 369 (D.C. Cir. 2008); *see, e.g.*, *CRT*, 511 F.3d at 194; *Edmonds*, 417 F.3d at 1322–23 (finding plaintiff substantially prevailed where the court directed defendant to produce documents by a specified date).  That is because once an order is adopted by a court explicitly requiring an agency to release documents, its compliance can no longer be described as voluntary, and the legal relationship between the parties has been changed by virtue of an enforceable order.  *See, e.g.*, *CRT*, 511 F.3d at 197; *Davy I*, 456 F.3d at 166. Applying those binding authorities, the Court finds that the plaintiffs are entitled to fees as the prevailing party.

Furthermore, plaintiffs substantially prevailed in their cross-motion for summary judgment because the motion prompted defendant to voluntarily and unilaterally change its position. Defendant argues that plaintiffs did not substantially prevail at the summary judgment stage because the Court largely granted defendant's motion and denied plaintiffs' motion. Therefore, defendant maintains that plaintiffs are not eligible for attorneys' fees on the time spent researching and drafting the motion. Def.'s Opp. at 20–21.  But two of the three issues plaintiffs raised in their motion were rendered moot when, "in an effort to narrow the issues," defendant voluntarily

released 188 records it had previously identified as non-responsive.[3]  *See* Supplemental Decl. of

Kathryn Sargeant [Dkt. # 28-2] ("Suppl. Sargeant Decl.") ¶¶ 16–17.  Thus, defendant voluntarily

altered its behavior in response to plaintiffs' cross-motion for summary judgment.

With those issues resolved, plaintiffs sought summary judgment on the remaining issue

concerning the applicability of a claimed exemption, and it opposed defendant's motion seeking

judgment in its favor on the adequacy of the search.  Plaintiffs' motion with respect to Exemption

5 was denied.  *See Urban Air Initiative*, 271 F. Supp. 3d at 251.  However, the Court agreed with

plaintiffs in part and denied defendant's motion in part because defendant had not conducted an

adequate search.  *Id*. at 263.  Thus, plaintiffs substantially prevailed on the search issue.

Furthermore, as part of its ruling, the Court ordered defendant to conduct a more thorough

search, provide more detailed justification for the adequacy of its searches, and release any

reasonably non-exempt records consistent with FOIA.  Order [Dkt. # 50].  As a result of this order,

defendant submitted a status report indicating that it was in the process of reviewing records from

the revised search, and it proposed a schedule to release those records.  *See* Joint Status Report

[Dkt. # 54]; Joint Status Report [Dkt. # 55].  The Court then adopted that schedule in the January

22, 2018 minute order and ordered the production of responsive records by certain dates.  Min.

Order (Jan. 22, 2018); *Davy I*, 456 F.3d at 165–66 (finding that plaintiff substantially prevailed

when the parties' joint stipulation was approved and memorialized in a court order).  Though

---

3       In that regard, this case is distinguishable from *Elec. Privacy Info. Ctr. v. FDA* ("*EPIC
III*"), which defendant claims is on "all fours" with the instant case.  Def.'s Opp. at 20–21.  The
court there found the agency's initial search was adequate and plaintiffs did not "substantially
prevail" when the court merely ordered a supplemental declaration addressing a specific search
requested by plaintiffs.  266 F. Supp. 3d 162, 166, 168 (D.D.C. 2017).  Conversely, the court did
find plaintiffs prevailed on an initial order which ordered the agency to produce non-exempt
records by a certain date, despite the agency's protestations that they would have released
documents even without such an order.

defendant characterizes this ruling as "marginal," Def.'s Opp. at 20, it substantially altered the state of the relationship between the parties, and it resulted in the production of an additional 1,140 records – a number equal to a quarter of the total number of records produced.  *See* Def.'s Statement of Facts in Support of its Renewed Mot. for Summ. J. [Dkt. # 66-2] ¶ 19.

Defendant also argues that despite these judicial orders, plaintiffs did not substantially prevail because litigation was not necessary to compel the production of documents.  Def.'s Opp. at 18.  EPA relies on *Hall & Assoc. v. Envt'l. Prot. Agency*, in which the court found litigation was not necessary, and therefore the plaintiff was not eligible for fees, even though the court had entered an order requiring the defendant to provide the plaintiff with responsive documents by a certain date.  210 F. Supp. 3d 13, 20 (D.D.C. 2016), *aff'd sub nom. Hall & Assocs. v. Envtl. Prot. Agency*, No. 16-5315, 2018 WL 1896493 (D.C. Cir. Apr. 9, 2018).  But in that case, plaintiff's FOIA requests were submitted in an improper form, and he did not timely clarify them with the agency before filing suit.  *Id.*  In affirming that decision, the appeals court noted that while plaintiff may have been "technically eligible for fees" because he obtained relief through judicial order, plaintiff was not *entitled* to fees because the agency's position regarding the FOIA request was "correct as a matter of law."  2018 WL 1896493 at *2.

The *Hall* case is inapposite since plaintiffs did not fail to take necessary steps before filing suit.  They worked with defendant to narrow the scope of their request, and they committed to covering any legitimate costs. Compl. ¶¶ 16–19, 20–21.  And, while defendant produced a handful of key records, by late June of 2015, the agency was still officially "uncertain" about how long it would take to locate and examine the bulk of the material that had been requested in February. June 25, 2015 EPA Reply. At that point it was reasonable for plaintiffs to seek the Court's assistance to obtain compliance with the statute.  *See EPIC III*, 266 F. Supp. 3d 162, 168 (D.D.C.

2017) (rejecting DEA's argument that they "would have released" records regardless of order because defendants did not meaningfully begin complying until after a complaint was filed); *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.* ("*EPIC II*"), 218 F. Supp. 3d 27, 41 (D.D.C. 2016) (significant delays in complying with FOIA may support an inference that an agency was seeking to ignore or forgot about a request and a fee award might be appropriate).

In sum, the Court finds that plaintiffs are eligible for a fee award since they substantially prevailed through judicial order and by causing a voluntary change in defendant's position.

## II.    Plaintiffs are entitled to a fee award.

When a plaintiff is eligible for a fee award, the court must next determine whether the plaintiff is also entitled to an award. *Davy I*, 456 F.3d at 166.  In analyzing entitlement, the court weighs four factors: (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records;[4] and (4) the reasonableness of the agency's withholding of the requested documents. *McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 711 (D.C. Cir. 2014).  "No one factor is dispositive," *Davy II*, 550 F.3d at 1159, and balancing is left to the district court's discretion. *Morley v. C.I.A.*, 894 F.3d 389, 391 (D.C. Cir. 2018).

The Court finds that the applicable factors weigh in favor of plaintiffs, and they are entitled to an award of attorneys' fees.

### A.  Public Benefit Derived from Plaintiffs' Case

To assess public benefit derived from the case, a court must determine whether the lawsuit "is likely to add to the fund of information that citizens may use in making vital political choices." *Davy II*, 550 F.3d at 1159–60, citing *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995).  The

---

4       The first three factors distinguish between requestors seeking documents for public information purposes, for which a public subsidy makes sense, and those with private advantage who need no incentive to litigate. *See Davy II*, 550 F.3d at 1160.

Court considers both the effect of the litigation for which fees are requested and the "potential public value" of the information sought. *Id.* at 1159. To have "potential public value" the request must have "at least a modest probability of generating useful new information about a matter of public concern." *Morley v. C.I.A.*, 810 F.3d 841, 844 (D.C. Cir. 2016). The "potential public value" of the information requested should be evaluated "with little or no regard as to whether any documents supplied prove to advance the public interest." *Id.*

Plaintiffs maintain their request benefited the public because it resulted in the production of "over 4,000 EPA records, including email records that highlight the influence of the oil industry on the EPAct study," which "affects air quality nationwide." Pls.' Mot. at 10, 23. These documents, which otherwise would not have been released, are now available to the public. *Id.* at 1, 10–11 (also noting that the emissions model based on the study is used to implement the Clean Air Act, an issue of national public importance). Defendant takes issue with this conclusion, arguing results of the EPAct study were made public in 2013, and the additional information released through this lawsuit only benefitted businesses specifically affected by EPA regulations. Def.'s Opp. at 26.

The Court rejects defendant's cramped viewpoint and finds that the documents released as a result of this action added to the public knowledge. Plaintiffs' request did not focus on the published results of the study; rather it sought information not available to the public – specifically, "everything that preceded the emissions testing that resulted directly in the reported results of any phase of the EPAct study." Revised FOIA Request; Def.'s Opp. at 26. The EPAct study was incorporated into the Congressionally mandated updated vehicle emissions model, MOVES2014, which has national implications for emissions and air quality and is used, in part, to implement the Clean Air Act nationally. Def.'s Mot. at 3; Sargeant Decl. ¶ 9. Plaintiffs sought to uncover errors

or "influence" in the study's design, and such information would be of interest to the multiple stakeholders involved in and affected by matters of national environmental policy and public health.

Indeed, plaintiffs subsequently released a public report of their findings. And, in their pleading, they refer to other media publications that made use of the records they obtained, such as *The Hill* and *Biofuels Digest*.[5] *See* Pls.' Mot. at 10–13. Plaintiffs also used the information they obtained in a formal effort to seek corrections to the EPAct study. *See id.* at 13; EPAct – Fuel Effects Study (RFC 17001), United States Environmental Protection Agency, https://www.epa.gov/quality/epact-fuel-effects-study-rfc-17001 (last visited February 26, 2020). As a result, this case stands in contrast to those cited by defendant where "the particularized nature of the released information" made it of limited public benefit. *See, e.g.*, *McKinley*, 739 F.3d at 711 (finding that the request yielded two documents "so heavily redacted that they contributed only 'scant' information to the public record"); *Fenster v. Brown*, 617 F.2d 740, 744–45 (D.C. Cir. 1979) (release of Defense Contract Audit Manual primarily helps government contractors with audits of their performance by the government and does not further general public interest); *Horsehead Indus., Inc. v. E.P.A.*, 999 F. Supp. 59, 69 (D.D.C. 1998) (court found likelihood that records would actually be disseminated to the public speculative and benefit "minimal" after plaintiff, thought by EPA to have contaminated a particular Superfund site, requested data on hazardous substances found at that site).

---

5       Defendant points out that only UAI, not co-plaintiff EFC, disseminated information obtained from their FOIA request. Def.'s Opp. at 26. There appears to be no requirement in the law that all parties to a FOIA request each equally disseminate information. There are a variety of reasons why one party might take the lead on releasing information, but both are still involved in acquiring and making its dissemination possible.

Thus, the Court finds that this factor weighs in favor of plaintiffs.

**B.  Commercial Benefit to Plaintiffs and Plaintiffs' Interest in the Records Sought**

The second and third factors – the commercial benefit to plaintiffs and the nature of their interest – are closely related and usually considered together.  *Davy II*, 550 F.3d at 1159–60.  These factors weigh against an award to a plaintiff who seeks disclosure for a commercial benefit or out of other personal motives, *see id.* at 1160, and instead "favor non-profit organizations . . . which 'aim to ferret out and make public worthwhile, previously unknown government information – precisely the activity that FOIA's fees provision seeks to promote.'"  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 69 (D.D.C. 2013), quoting *Davy II*, 550 F.3d at 1160; *see Nationwide Bldg. Maint.*, 559 F.2d at 712 (noting courts generally disallow awards to large corporate interests or representatives of such interests, except news interests).

While both plaintiffs are non-profit organizations, Compl. ¶¶ 3–4, defendant argues that UAI[6] is not entitled to fees because it is "inextricably linked" to an ethanol plant construction company, ICM, Inc. ("ICM"), and ICM may benefit commercially from the release of the requested information.  Def.'s Opp. at 29.  Defendant contends that plaintiffs sought the documents to undermine the MOVES2014 model and EPAct Study, which showed that increasing the concentration of ethanol in gasoline contributes to increased emissions of various pollutants.  *Id.* at 30.  Since ICM builds and supports ethanol plants, undermining the government's study would be commercially advantageous to it.

To support its contention that UAI should be viewed as the alter ego of ICM, defendant points to the following facts: (1) UAI's president is also ICM's founder; (2) ICM and UAI share

---

[6]    EPA does not dispute that EFC is a non-profit organization that has no commercial interest in the records.

18

an address; (3) several leaders and staff members within the two organizations overlap; and (4) ICM makes regular financial contributions to UAI. *See* Def.'s Opp. at 28–31. UAI does not dispute its connections with ICM, but it points out that ICM is not a party to this suit, ICM does not pay for UAI's attorneys, and UAI is an independent nonprofit organization, not a subsidiary of ICM. Pls.' Mot. at 12–13. UAI maintains that it was created to "educate the general public on the health dangers of toxic aromatics and reduce aromatics from mobile emission sources in urban areas," not to advance the commercial interests of ICM. Articles of Incorporation, Urban Air Initiative, Ex. D to Pls.' Reply [Dkt. # 78-4] at 2. In advancing that mission, UAI works on "technical research, improving public policy, and education to expose the health threats caused by harmful compounds in gasoline." Welcome to Urban Air Initiative, Urban Air Initiative, https://fixourfuel.com/ (last visited Feb. 26, 2020). In sum, UAI maintains that the nonprofit and the ethanol company are two separate entities that have different goals and purposes, Pls.' Reply at 12–13, and that it "sought the requested information to expose the oil industry's influence over the EPAct study's design," not to gain any commercial benefit. Pls.' Reply at 11.

At the end of the day, while defendant has identified facts that suggest there may have been some potential benefit to ethanol producers such as ICM stemming from this action, that does not entirely negate the broader public aspects of plaintiffs' work.

Significantly, defendant does not argue that plaintiff UAI, a nonprofit organization, was seeking to benefit *itself* commercially, but it suggests that the goal of the FOIA action was to benefit ICM commercially, which in turn would allegedly benefit UAI. *See Davy II*, 550 F.3d at 1160 ("The second factor considers the commercial benefit *to the plaintiff*.") (emphasis added). But UAI's ambit and public advocacy extends beyond its relationship with ICM. In submitting the FOIA request, it advanced several public and policy-oriented goals, and once UAI received the

documents, it made the requested information available to the public.  Compl. ¶ 3.  Thus, UAI's interest cannot be said to be "*purely* commercial."  *Davy II*, 550 F.3d at 1160–61 (emphasis added) (finding that the intention to publish a book does not mean the nature of plaintiff's interest was "purely commercial" and to the extent plaintiff had "a scholarly interest in publishing publicly valuable information in a book, his interest [was] at most 'quasi-commercial'").[7]

Moreover, defendant fails to state how the release of information about the EPAct Study and the MOVES2014 emissions model would lead to an increase in ethanol use, much less in such a way that would benefit ICM, and UAI, specifically.  In *Campaign For Responsible Transplantation v. FDA*, the agency unsuccessfully argued that the plaintiff nonprofit group – dedicated to raising awareness about the dangers of cellular treatment therapy – should not recover fees because it would use the requested information to seek a total ban on the therapy and its professional membership would benefit commercially from such a ban.  593 F. Supp. 2d 236, 241–42 (D.D.C. 2009).  The agency did not state how the release of the requested documents would necessarily lead to a prohibition of a particular cellular treatment therapy, and the court refused to make that "logical leap."  *Id.*  Here, defendant asks the Court to make a similar "logical leap."  While ICM would benefit from increased ethanol use, defendant has not shown how the release of information about the study underlying the MOVES2014 emissions model would necessarily lead

---

7       In contrast, the court in *Alliance for Responsible CFC Policy v. Costle* found sufficient commercial interest where the plaintiff nonprofit was formed by a group of chlorofluorocarbons (CFC) producers specifically in response to EPA's notice that it would start regulating CFC production.  631 F. Supp. 1469, 1469 (D.D.C. 1986).  "[P]laintiff was a well-funded entity created for the advancement of the private interests of its constituent entities."  *Id.* at 1471.  Because the impending regulation would directly curtail their business, the producers had sufficient private incentive to litigate for production of EPA's rulemaking documents and could not show their suit was prompted "even in part" by public concerns.  *Id.*  Here, UAI was not created in response to any regulation, and it has not been shown that its purpose is to advance a pro-ethanol agenda.

to such an increase and thereby benefit plaintiff UAI.   *See* Def.'s Opp. at 29; Pls.' Reply at 14–15.

A closer question, however, is whether plaintiffs were motivated by their own personal and commercial interests when they utilized FOIA as a substitute for discovery in litigation challenging MOVES2014.   *See* Def.'s Opp. at 27–28.   Along with Kansas and Nebraska,[8] plaintiffs sought judicial review of the MOVES2014 model, and they were explicit about their intention to use the requested documents in that litigation.   *See* Ex. O to Compl. [Dkt. # 1-1] (letter from plaintiffs to EPA asking for native electronic documents by September 16, 2015 so plaintiffs could review them in conjunction with EPA's reply brief in MOVES2014 challenge).

"The primary purpose of the FOIA was not to benefit private litigants or to serve as a substitute for civil discovery."   *Baldrige v. Shapiro*, 455 U.S. 345, 360 n.14 (1982).   Thus, courts have found in some circumstances that a plaintiff does stand to gain a commercial or private benefit when it seeks documents that could aid efforts in ongoing civil litigation.   *See, e.g.*, *Dorsen v. S.E.C.*, 15 F. Supp. 3d 112, 123 (D.D.C. 2014); *Republic of New Afrika v. F.B.I.*, 645 F. Supp. 117, 121 (D.D.C. 1986); *Simon v. United States*, 587 F. Supp. 1029, 1033 (D.D.C. 1984).   As the D.C. Circuit has explained, when a plaintiff has a commercial benefit or a personal interest in pursuing litigation, "an award of fees is generally inappropriate" because there is already sufficient motivation for the claimant to bring suit without the promise of attorneys' fees.   *See Fenster*, 617 F.2d at 743; *see also Cotton*, 63 F.3d at 1120 ("When a litigant seeks disclosure for a commercial benefit or other personal reasons, an award of fees is usually inappropriate.") (citation omitted).

In this line of cases, though, the courts have reasoned that it was the potential to award damages or personal vindication in the separate civil suit that provided sufficient incentive to

---

8      ICM did not participate in the lawsuit.

pursue the FOIA action, and there was no need for a fee award to serve that purpose.  For example, in *Dorsen*, the Court found that plaintiff had a sufficient personal and commercial interest in obtaining the documents because his ultimate goal was to "obtain relief from a $63 million judgment against him" and to "rehabilitate his image in the eyes of the community."  15 F. Supp. 3d at 123.   In *Republic of New Afrika*, the Court found a personal and commercial interest when plaintiff, a nonprofit organization, sought records about FBI activities to exonerate certain of its members from criminal prosecution and to aid in civil discovery in a case against the government for substantial money damages.  645 F. Supp. at 122.  In *Simon*, plaintiff had been terminated from his employment at the Patent and Trademark Office, and he requested documents pertaining to his employment to support a separate civil lawsuit challenging the dismissal.  587 F. Supp. at 1032.  The Court found that his interest in the documents were purely "personal" and thus attorney's fees for the FOIA litigation were not recoverable.  *Id.*

Here, the Court recognizes that plaintiffs' FOIA litigation was initiated to obtain documents that could be used in a separate civil lawsuit.  But plaintiffs have made clear that their interest in both the FOIA request and the separate lawsuit involving MOVES2014 was to challenge the emissions factors and the potential oil industry influence underlying the EPAct study and its conclusions.   Pls.' Mot. at 1.   UAI contends that its "sole motivation for challenging the MOVES2014 model in the D.C. Circuit was its belief that the model's erroneous inputs could harm human health."  Pls.' Reply at 15.  Most important, UAI was not requesting any monetary relief in the civil case – it sought only vacatur of the model.[9]  *See Kansas v. EPA* Brief at 61–62.

---

9      For this reason, UAI recognizes that it may be deemed to lack standing to challenge EPA's release of MOVES2014.  Pls.' Reply at 15.

Thus, plaintiffs' motives were not purely "personal" or "commercial" within the meaning of the statute, although there may have been, as noted above, some potential commercial benefit to the ethanol industry backers of plaintiff UAI's work.   The pending judicial challenge to the MOVES2014 model did not supply a financial incentive to litigate the FOIA request without the possibility for a fee award.   But, because plaintiffs made it clear that they requested the documents to aid their judicial challenge, the Court finds that these factors do weigh in some small measure against plaintiffs, and all of these circumstances will bear on the Court's discretion in fashioning an award.   *See Reyes v. U.S. Nat'l Archives and Records Admin.*, 356 F. Supp. 3d 155, 165–66 (D.D.C. 2018) (where plaintiff used a FOIA request as a substitute for civil discovery, the Court only granted minimal weight against the request for attorney's fees because the award in the civil litigation was minimal and the documents were important to thousands of other people).

## C. Reasonableness of EPA's Position

The fourth and final factor "evaluates why the agency initially withheld the records." *Morley*, 894 F.3d at 392.   It requires the Court to evaluate whether defendant was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." *McKinley*, 739 F.3d at 712 (internal citations omitted).   "The question is not whether [plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Davy II*, 550 F.3d at 1163; *see also Am. Immigration Council v. Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 407 (D.D.C. 2015); *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 878 F. Supp. 2d 225, 237 (D.D.C. 2012). If the government's position in declining to release the records at issue is "correct as a matter of law, that will be dispositive. If the Government's position is founded on a colorable basis in law," however, "that will be weighed along with other relevant considerations

in the entitlement calculus." *Chesapeake Bay Found., Inc. v. U.S. Dep't of Agric.*, 11 F.3d 211, 216 (D.C. Cir. 1993).

Plaintiffs maintain that defendant cannot make such a showing because it unjustifiably withheld thousands of non-exempt records for months until plaintiffs filed suit, and it did not even begin to conduct its search of electronic records until two months after the suit was filed.[10]  *See* Pls.' Mot. at 16.  Based on the undisputed chronology set forth above, the Court finds that defendant has not provided any colorable basis in law for its delays, and thus this factor weighs in favor of plaintiffs.

As the D.C. Circuit has explained, the fourth factor is meant to "incentiviz[e] the government to promptly turn over – before litigation is required – any documents that it ought not withhold." *Davy II*, 550 F.3d at 1166 (Tatel, J., concurring).  Courts in this district have held that administrative delay and FOIA backlog do not form a "reasonable basis in law" for withholding documents, because "this purpose would not be served if it were reasonable for agencies to withhold documents for indeterminant periods of time because they have too many FOIA requests and too few FOIA staff members." *Reyes*, 356 F. Supp. 3d at 167–68 (where defendant did not tell plaintiff that it intended to comply with her request until she filed suit 120 days after she submitted her FOIA request, defendant did not present a reasonable basis in law for withholding documents); *see Am. Oversight v. U.S. Dep't of Justice*, 375 F. Supp. 3d 50, 67–69 (D.D.C. 2019) (defendants did not have a reasonable basis for withholding documents that were eventually

---

10     For this statement, plaintiffs cite to the Declaration of Kathryn Sargeant.  Pls.' Mot. at 16. But the declaration indicates that EPA initiated the search in May to June 2015, while this suit was filed August 2015.  Sargeant Decl. ¶¶ 24–34.  The declaration indicated, however, that defendant did not conduct its responsiveness review of electronic records until January 2016.  *Id.* ¶ 35 ("In January 2016, two collections of documents . . . were created to facilitate the review and processing of potentially responsive records.").

produced due to a backlog or administrative issues); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 236 (D.D.C. 2011) (where defendant did not provide plaintiff with any information concerning the status of its FOIA requests and at no point informed plaintiff of an administrative backlog or seek to extend its time to respond to the FOIA requests, defendant did not present a reasonable basis in law for withholding documents).

Here, defendant should have at least informed plaintiffs that it intended to comply with their request by May 14, 2015, at the latest.  Revised FOIA Request; Compl. ¶ 32.   But defendant did not respond until June 15, and at that point, it requested to extend the deadline to February 15, which would have been more than a year after the original FOIA request was submitted.  On June 15, defendant informed plaintiffs of the reasons for the delay, which included inadequate staffing staff, management, and legal resources.  *See* Ex. P to Compl. [Dkt. # 1-1].  Afterwards, it stayed in communication with plaintiffs regarding review of documents and production.  But, by the time the lawsuit was filed, only three documents had been produced, and defendant had told plaintiff that it had yet to determine whether other records would be released and what records were exempt from disclosure.  *Id.*

While defendant did not ignore plaintiffs, and its behavior cannot fairly be described as "recalcitrant" or "obdurate," it was not especially responsive either.  Given the time that elapsed between plaintiffs' FOIA request and the agency's response, and the fact that the only reason provided for the delay was lack of resources, the Court cannot find that the agency has asserted a

"colorable basis in law" for withholding documents.[11]  *See Bricker v. FBI*, 54 F. Supp. 2d 1, 4 (D.D.C. 1999) ("[A]gencies should not be allowed to hide behind the FOIA backlog.").  Thus, the Court finds that this factor weighs slightly in favor of plaintiffs.

Considering the four factors, then, plaintiffs are entitled to an award of attorneys' fees.

## III.  Plaintiffs' requested award will be reduced; the use of the higher *Laffey* matrix is unsupported and the hours expended were excessive.

Attorneys' fees and costs are calculated by multiplying "the hours reasonably expended in the litigation by a reasonable hourly fee."  *Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998).  Courts have broad discretion in determining an appropriate fee award and may modify the request based on the reasonableness of the desired amount and the facts of the case.  *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 203 (D.D.C. 2016), citing *Judicial Watch*, 470 F.3d at 369.  Plaintiffs bear the burden for establishing reasonableness. *Covington*, 57 F.3d at 1107–08.

To establish reasonableness of hours spent, plaintiffs must submit "sufficiently detailed information about the hours logged and the work done . . . to permit the District Court to make an independent determination whether or not the hours claimed are justified."  *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982).  "Fees are not recoverable for nonproductive time, nor . . . time expended on issues on which plaintiff did not ultimately prevail."  *Id.*  The court should consider "the relationship between the amount of the fee

---

11    Defendant maintains that because the Court ultimately ruled that its withholdings under certain exemptions were appropriate, that means its basis for withholding documents was reasonable.  But those exemptions aside, defendant eventually released over four thousand records as a result of this action, and it has not provided any reasonable basis for withholding those records previously.  *See ACLU v. DHS*, 810 F. Supp. 2d 267, 277 (D.D.C. 2011) (where the court upheld the exemptions claimed by defendant, the court found that defendants' asserted reason of administrative backlog was not a reasonable basis for withholding the records defendant eventually produced).

[requested] and the results obtained." *See EPIC I*, 999 F. Supp. 2d at 76; *see also Hensley v. Eckerhart*, 461 U.S. 424, 436–37 (1983) ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.").

Plaintiffs seek a total award of $189,288.40:  $141,792.60 for litigation-phase attorneys' fees; $400 in costs; and $47,095.80 in ''fees-on-fees'' for time spent negotiating and litigating fees.  Pls.' Mot. at 2, 17.  The award sought incorporates three reductions from the total amount of effort expended: (1) the exclusion of work after the Court's January 22, 2018 order that did not lead to any further production; (2) a 75% reduction of document review fees "in an exercise of reasonable billing judgment"; and (3) a 33.3% reduction of litigation fees to "reflect the denial of one of [p]laintiffs' three arguments on summary judgment."  Decl. of Adam R.F. Gustafson [Dkt. # 71-2] ("Gustafson Decl.") at 3.  Plaintiffs have submitted affidavits from and time records for two attorneys who spent a total of 624.3 hours on related work billed at rates from the Legal Services Index-adjusted *Laffey* Matrix ("LSI *Laffey* Matrix"), a fee schedule for complex federal litigation based on an attorney's experience level.  Gustafson Decl.; Decl. of James R. Conde [Dkt. # 71-5] ("Conde Decl.").  Plaintiffs also provided the Court with a copy of a 2013 affidavit from Dr. Michael Kavanaugh, who developed the LSI *Laffey* Matrix.  Decl. of Michael Kavanaugh, Ex. B to Pls.' Mot. [Dkt. # 71-4] ("Kavanaugh Decl.").

Defendant takes the position that plaintiffs' requested award is unreasonable because (1) full *Laffey* rates do not reflect the straightforward nature of this case; (2) plaintiffs cannot recover for time spent reviewing produced documents; (3) plaintiffs spent unnecessary time drafting memoranda challenging FOIA redactions; (4) plaintiffs spent excessive time on work related to summary judgment; and (5) plaintiffs claimed excessive amounts of time spent on simple tasks.  Def.'s Opp. at 34–43.  In addition, defendant argues that plaintiffs are not entitled to "fees-on-

fees," or at least not the full amount requested, because the time spent on related motions was also unreasonable.  *Id.* at 43–45.

The Court finds that there is some merit to defendant's arguments, and in its discretion, it will award a reduced fee applying the reasoning set forth below.

### A. Plaintiffs have not met their burden to establish that the requested rate is reasonable.

Plaintiffs bear the burden of establishing the reasonableness of the hourly rates charged by their attorneys for services rendered in the underlying proceedings.  *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015).  "Whether an hourly rate is reasonable turns on three sub-elements: (1) 'the attorney's billing practices,' (2) 'the attorney's skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'"  *Id.*, quoting *Covington*, 57 F.3d at 1107.

To establish the prevailing market rate, a plaintiff must "'produce satisfactory evidence – *in addition to* the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  *Eley*, 793 F.3d at 100, quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) (emphasis in original).  Once the plaintiff has made its showing, the burden shifts to the defendant to rebut the requested rate with "equally specific countervailing evidence." *Covington*, 57 F.3d at 1109–10.

Fee matrices are "one type of evidence that 'provides a useful starting point' in calculating the prevailing market rate."  *Eley*, 793 F.3d at 100, quoting *Covington*, 57 F.3d at 1109. A fee matrix is "a chart averaging rates for attorneys at different experience levels.  For decades, courts

in this circuit have relied on some version of what is known as the *Laffey* matrix." [12]   *DL v. District of Columbia*, 924 F.3d 585, 587 (D.C. Cir. 2019). The original *Laffey* matrix, which was created in the 1980s, relied upon "a relatively small sample of rates charged by sophisticated federal-court practitioners in the District of Columbia." *Id.* at 587.   Since then, it has been updated periodically to reflect inflation.   Two competing *Laffey* matrices have emerged – the Legal Services Index ("LSI") Matrix and the United States Attorney's Office ("USAO") Matrix – each adjusting for inflation in different ways.   *Id.* at 589.   The rates included in the LSI Matrix are the higher of the two.   *See id.* at 591.   While the LSI Matrix is designed to reflect the hourly rates charged by federal court practitioners who litigate complex cases in Washington, D.C., the USAO Matrix has been based, since 2015, on "data for all types of lawyers – not just those who litigate complex federal cases – from the entire metropolitan area." *Id.* at 587.

Plaintiffs seek to recover attorneys' fees based on the LSI *Laffey* Matrix rates.   Because the D.C. Circuit deems fee matrices as "somewhat crude," fee applicants must "supplement[] fee matrices with other evidence such as 'surveys to update the[m]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases.'"   *Eley*, 793 F.3d at 101, quoting *Covington*, 57 F.3d at 1109.

Plaintiffs have supplied two affidavits from their attorneys, Adam R.F. Gustafson and James R. Conde.   Both are lawyers at Boyden Gray and Associates, the law firm that represented plaintiffs.   Gustafson stated that he is a 2009 graduate from Yale Law School and that he is a

---

12      The *Laffey* Matrix was first set forth in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).   *Eley*, 793 F.3d at 100.

member of good standing of the D.C. Bar.  Gustafson Decl. ¶ 3.  He further stated that he used the LSI *Laffey* Matrix to calculate the lodestar amount and that "LSI Laffey rates are approved by the D.C. Circuit." *Id.* ¶ 8.  Conde's declaration does not address the relevant rates, but it sets forth that he is a 2015 graduate of the Antonin Scalia Law School, an associate at the law firm, and a member of good standing of the Virginia and D.C. Bars.  Conde Decl. ¶¶ 1–7.  Plaintiffs also submitted a 2013 declaration, prepared for another case, from Dr. Michael Kavanaugh, the creator of the LSI Matrix.  The declaration explained the methodology of the LSI Matrix and why, in his view, it is a more accurate representation of the prevailing market rates for complex federal litigation in Washington, D.C.  Kavanaugh Decl. ¶¶ 5, 15–25.

Plaintiffs' evidence is insufficient to establish that "the requested [hourly] rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11.  The attorney affidavits do not recite "precise fees that attorneys with similar qualifications have received" in other comparable cases. *DL*, 924 F.3d at 589, citing *Covington*, 57 F.3d at 1109; *see also Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326 ("[W]hen the attorney states his belief as to the relevant market rate, he should be able to state . . . that it was formed on the basis of several specific rates he knows are charged by other attorneys.").  And, while Dr. Kavanaugh's declaration is helpful in understanding the method by which the rates in the LSI Matrix were calculated, it is not helpful in determining whether the LSI Matrix should apply in this particular case. *Eley*, 793 F.3d at 104 (finding plaintiff had not met the burden of justifying the reasonableness of the rates where her evidence consisted of declaration from Dr. Kavanaugh explaining the LSI *Laffey* matrix, the lawyer's affidavit averring that she charged his paying clients the rates found in the LSI *Laffey* matrix, and the lawyer pointed to four decisions that had utilized the LSI *Laffey* matrix in similar cases).

In accordance with the guidance in *Eley*, the Court finds that the evidence presented is insufficient to establish that the market rate for FOIA practitioners in Washington, D.C. comports with the LSI Matrix, and that plaintiffs have not met their burden to show that it would be reasonable to apply the higher LSI adjusted *Laffey* Matrix rates in this case. Thus, the Court will apply the lower USAO Matrix rates. *See* USAO Attorney's Fees Matrix, 2015-2020, available at https://www.justice.gov/usao-dc/page/file/1189846/download (last visited February 26, 2020).

Using these rates, based upon the time records submitted by plaintiffs' attorneys, the new totals would be:

- Litigation Fees: $187,103.70[13]

---

13    The following charts show the Court's calculations using the USAO Matrix rates regarding the litigation fees for each attorney:

| Adam R.F. Gustafson - Litigation Fees | | | | |
|---|---|---|---|---|
| Years | Experience | Hours | Rate | Total |
| 2015-16 | 7 years | 68.8 | $332 | $22841.6 |
| 2016-17 | 8 years | 39.2 | $395 | $15484 |
| 2017-18 | 9 years | 32.5 | $410 | $13325 |
| 2018-19 | 10 years | 4.8 | $417 | $2001.6 |
| | | 145.3 | | $53,652.2 |

| James Conde - Litigation Fees | | | | |
|---|---|---|---|---|
| Years | Experience | Hours | Rate | Total |
| 2015-16 | 1 year | 136.3 | $284 | $38709.2 |
| 2016-17 | 2 years | 230.75 | $322 | $74301.5 |
| 2017-18 | 3 years | 61.2 | $334 | $20440.8 |
| | | 428.25 | | $133,451.5 |

- Fees-on-Fees: $35,574.10[14]
- Costs: $400

Thus, the new lodestar amount is $223,077.80.  After applying the same voluntary reductions plaintiffs applied,[15] the litigation fees total $126,377.22, bringing the lodestar amount to $162,351.32.

### B. The Court finds some of the components of the litigation fee to be reasonable and others excessive.

#### 1. Plaintiffs may recover for some time spent reviewing produced documents.

Defendant challenges some of the individual components of the total fee, including the time spent reviewing records produced by the agency.  Generally, plaintiffs should not recover fees for time spent reviewing responsive documents, because the lawyers would have performed that task even in the absence of litigation.  *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 825 F. Supp. 2d 226, 231 (D.D.C. 2011) (plaintiff was "not entitled to recover for time spent reviewing the documents it instituted this lawsuit to obtain");

---

14      The following charts show the Court's calculations using the USAO matrix rates regarding the fees-on-fees for each attorney:

| Adam R.F. Gustafson – Fees-on-Fees | | | | |
|---|---|---|---|---|
| Years | Experience | Hours | Rate | Total |
| 2018-19 | 10 years | 11.9 | $417 | $4962.3 |
| 2019-20 | 11 years | 16 | $510 | $8160 |
| | | 27.9 | | $13,122.3 |

| James Conde – Fees-on-Fees | | | | |
|---|---|---|---|---|
| Years | Experience | Hours | Rate | Total |
| 2018-19 | 4 years | 38.8 | $351 | $13618.8 |
| 2019-20 | 5 years | 24.2 | $365 | $8833 |
| | | 63 | | $22,451.8 |

15      The Court excluded fees for work performed after January 22, 2018, reduced document review fees by 75%, and reduced fees related to summary judgment by 33%.

*Am. Immigration Council*, 82 F. Supp. 3d at 412 (document review is a "post-relief" activity). However, courts have granted some fees where document review is necessary to evaluate the sufficiency of production or to challenge withholdings. *See, e.g.*, *Elec. Privacy Info. Ctr*, 811 F. Supp. 2d at 240 ("[I]t would seem critical to the prosecution of a FOIA lawsuit for a plaintiff to review an agency's disclosure for sufficiency."); *Elec. Privacy Info. Ctr. v. FBI*, 72 F. Supp. 3d 338, 351 (D.D.C. 2014) (finding it "reasonable that EPIC's counsel reviewed the 2,462 pages of documents the FBI produced during this case to ensure the agency's compliance with FOIA" and court order).

Here, plaintiff seeks fees for document review that occurred after production was ordered by this Court on February 12, 2016. *See* Attorneys' Fees Summary, Ex. A to Pls.' Mot. [Dkt # 71-3] ("Conde & Gustafson Fees") at 11; Def.'s Opp. at 38. Given that thereafter, plaintiffs filed an opposition and cross-motion for summary judgment challenging the adequacy of EPA's search, as well as certain redactions and withheld documents, it is apparent that document review was, in part, a necessary aspect of the litigation, and therefore, some fees are warranted given the ultimate outcome of those issues. For those reasons, it was not unreasonable for the plaintiffs to propose including a percentage of the time spent on document review in their calculation; plaintiffs seek 25% of the total amount of time spent on document review – or $ 7,458.10 – in the fee calculation.

### 2. The fees sought for work related to summary judgment briefing are excessive.

Defendant also questions the amount of time spent on the summary judgment briefing. From April 25 to May 17, 2016, the lawyers devoted approximately 65.4 hours to researching and drafting a FOIA "redactions memorandum" which was to be used in connection with summary judgment proceedings. Conde & Gustafson Fees at 11–12. Between September 12 and October

15, 2016,[16] the attorneys spent approximately 90.2 hours drafting their combined cross-motion for summary judgment and opposition to defendant's motion. *See id.* at 5, 12–13; Def.'s Opp. at 40–42. In the cross-motion, they argued that defendant's invocation of Exemption 5 was not proper and that defendant could not withhold two categories of documents. Pls.' Cross-Mot. at 22–26. They also opposed defendant's motion on the grounds that the search was inadequate. *Id.* at 31. On December 8, 2016, after re-reviewing its Exemption 5 withholdings and "in an effort to narrow the issues," defendant released an additional 188 responsive documents, *see* Suppl. Sargeant Decl. ¶¶ 16–17, thereby rendering plaintiffs' arguments on these issues moot. Then, between March 6 through May 24, 2017, plaintiffs' lawyers spent another 104.9 hours drafting the cross-reply in support of their cross-motion for summary judgment. Conde & Gustafson Fees at 6, 13–14.

The Court finds that the request to be compensated for more than 260 hours of work related to summary judgment is excessive in this case. Plaintiffs state that the redactions memorandum was prepared to outline a strategy to defeat defendant's withholdings. Pls.' Reply at 22. So, that memorandum was prepared to contest an issue that plaintiffs ultimately did not prevail on; the applicability of the claimed FOIA exemptions on the released documents. It did not relate to the main issue that moved forward: the adequacy of the search. Furthermore, plaintiffs were ultimately unsuccessful in their argument regarding Exemption 5; the Court ruled that those documents were properly withheld. So, no fees are warranted for that portion of the work, which amounted to 14 pages (or almost 40%) of the 36-page opposition and cross-motion, and 7 pages (or almost 30%) of the 24-page reply. Furthermore, spending over 100 hours – more time than was spent on the motion itself – on a reply that was largely repetitive, and was only 24 pages long, was also unreasonable. For these reasons, the Court will reduce the total award.

---

16      The motion was filed on October 14, 2016, but the exhibits were filed on October 15, 2016.

**3.   There are no grounds to conclude that the attorneys charged too much for simple tasks.**

Defendant also complains that plaintiffs spent excessive time on "tasks that do not require complex litigation strategy" such as sending and reading emails.  Def.'s Opp. at 43.  Defendant does not specify the number of hours it believes were excessively dedicated to such tasks, but it merely points to a few examples and argues, without citing any legal authority, that this warrants a reduction in the award.

Courts in this district have reduced fees when administrative tasks have been duplicated across several attorneys or otherwise improperly delegated to attorneys billing at higher rates.  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 197 F. Supp. 3d 290, 296 (D.D.C. 2016) (court finds overstaffing to be "the main culprit" resulting in inefficiencies in plaintiff's work and chooses to discount the total amount rather than engage in line-by-line assessment).  However, there is no such issue here.  A review of Gustafson's time records shows that most of his work was in the nature of oversight, coordination, and review – as expected of a senior attorney.  The Court does not find that tasks such as emailing clients or opposing counsel need to be isolated and struck from plaintiffs' requested award as they are necessary parts of litigating a claim.  *Id.* at 295 ("The goal in awarding fees is not line-item supervision of billing practices but 'rough justice.'").

Therefore, the Court will not reduce the amount on the basis that excessive time spent on "simple" tasks.

**4.   Plaintiffs total award is excessive in light of the nature of the lawsuit and results.**

Finally, considering all of the facts set forth above, the Court concludes, in its discretion, that the requested award would be excessive when one considers such factors as the number of issues involved, the fact that plaintiffs prevailed on some issues but not others, the fact that

plaintiffs were ultimately unsuccessful on portions of their cross-motion for summary judgment and cross-reply, the complexity of the matters raised, the fact that plaintiffs pursued this action to advance their own pending civil case, *see* section II.B, *supra*, and the number of documents obtained as a result of the litigation.  Therefore, the Court will award litigation fees in the amount of $65,000.00.  *See EPIC I*, 999 F. Supp. 2d at 76, citing *Hensley*, 461 U.S. at 436–37 (emphasizing court's discretion to either identify specific hours to eliminate or simply reduce the award).

### C.  Plaintiffs' request for fees-on-fees is unreasonably high.

"While it is settled in this circuit that hours reasonably devoted to a request for fees are compensable, fees on fees must be reasonable, and not excessive."  *Elec. Privacy Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 162 (D.D.C. 2015) (internal citations and edits omitted).  The Court must "scrutinize" fees-on-fees "to insure that the total is reasonable and . . . does not represent a windfall for the attorneys."  *Id.* at 162–63, citing *Boehner v. McDermott*, 541 F. Supp. 2d 310, 325 (D.D.C. 2008); *see also Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 959–60 (D.C. Cir. 2017) (Henderson, J., concurring).

Here, after adjusting the applicable rates to those found in the USAO Matrix, plaintiffs seek $18,581.10 in ''fees-on-fees'' for 50.7 hours spent on the motion for attorneys' fees and $16,993.00 for another 40.2 hours of work required to reply to EPA's opposition.  *See* Pls.' Mot. at 2, 17; Pls.' Reply at 24.

A total of $35,574.10 in fees-on-fees represents almost 30% of the claimed total litigation costs (after the voluntary reductions were applied).  Further, it is not clear why the reply brief took almost as many hours – and therefore cost almost as much – as the application.  For these reasons, the Court finds that granting plaintiff a $35,574.10 fees-on-fees award would constitute an unsupportable windfall.  *See, e.g.*, *Baylor*, 857 F.3d at 959 (noting that fee petition was excessive

in part because time spent on fee litigation "easily exceeded" work on the underlying claim).

Defendant's objection to this portion of the fees in its entirety, though, is not well-taken given that

it briefed an objection to every single aspect of plaintiffs' eligibility for and entitlement to fees, as

well as the reasonableness of the rates and the time expended.  Thus, in an exercise of its discretion,

the Court will award $10,000.00 in fees-on-fees.

## CONCLUSION

For the reasons set forth above, plaintiffs' application for attorneys' fees and costs is

granted in part and denied in part.  Defendant must pay plaintiffs $75,400.00 in attorneys' fees and

costs.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: February 27, 2020